SIDLEY AUSTIN LLP
Bojan Guzina (admitted *pro hac vice*)
William E. Curtin
Justin Song
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
bguzina@sidley.com
wcurtin@sidley.com
justin.song@sidley.com

Penny Reid
Angela C. Zambrano (*pro hac vice* pending)
Robert S. Velevis (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 969-3501
penny.reid@sidley.com
angela.zambrano@sidley.com
rvelevis@sidley.com

*Counsel for Plaintiff Seabras Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>Seabras 1 USA, LLC *et al.*,<br><br>                Debtors.[1] | Chapter 11<br><br>Case No. 19-14006 (SMB)<br><br>(Jointly Administered) |
| Seabras Group, LLC,<br><br>                Plaintiff<br>v.<br><br>Seabras 1 Bermuda, Ltd,<br>Seaborn Management, Inc.,<br><br>                Defendants. | Adv. Pro. No: 20--_____ |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are Seabras 1 USA, LLC (0027) and Seabras 1 Bermuda Ltd. (7149). The Debtors' principal offices are located at 600 Cummings Center, Suite 268Z, Beverly, MA 01915.

1

**ADVERSARY COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Seabras Group, LLC ("Seabras Group") files this Adversary Complaint against nominal Defendant Debtor Seabras 1 Bermuda, Ltd. ("Seabras Bermuda") and Defendant Seaborn Management, Inc. ("Seaborn Management") and alleges and states as follows:

**NATURE OF THE ACTION**

1. Defendant Seaborn Management, a third-party management services company engaged by the shareholder Seabras Group, is attempting to use the Debtor's bankruptcy filing to freeze its position as service provider (and the accompanying fees) and sever Seabras Group's governance of Seabras Bermuda as the Debtor. Restoring the intended and proper governance as soon as possible is necessary for the efficient and value-maximizing operation of this estate, for a successful and inexpensive reorganization, and ultimately the integrity of the chapter 11 process.

2. Seabras Group respectfully requests a declaratory judgment and associated injunctive relief that: (1) Seabras Group validly possesses all governance and control rights over Seabras Bermuda; (2) an event of default under Seabras Bermuda's credit facility did not automatically sever voting control, and that Seabras Group's appointments to Seabras Bermuda's board of directors (the "Seabras Bermuda Board") are valid; and (3) even if an event of default under Seabras Bermuda's credit facility had severed voting control, then such an event of default did not end Seabras Group's governance right to direct the activities of Seaborn Management pursuant to the Management Services Agreement, which continues to be a binding contract between Seabras Group and Seaborn Management.

3. Seaborn Management wants this Court to believe that it is proper for Seaborn Management to operate as both the principal and the agent, as both the Debtor and the primary service provider to the Debtor. That is not the agreed-upon governance structure, and indeed, it

2

leads to irreconcilable conflicts. Seaborn Management is merely a for-hire service provider that is paid a fee for its services. As such, Seaborn Management has incentives to maximize its revenue stream and make it difficult for the stakeholders to consider other service providers that may be able to provide the same services at lower cost or with better results. The estate and all of its stakeholders will be harmed if this self-interested service provider is able to continue with this charade. Allowing Seaborn Management to retain control of the Debtor for itself would threaten the Debtor's reorganization by limiting the consideration of other value maximizing alternatives.

4. Seabras Group is the equity holder of an "in the money" asset with significant equity value. Seabras Group, unlike Seaborn Management, has an interest in maximizing value and not merely obtaining fees for services; Seabras Group never yielded control to Seaborn Management, nor would it have been rational for it to do so after investing hundreds of millions of dollars in Seabras Bermuda. Instead, Seaborn Management usurped control of the Debtor and then initiated these chapter 11 cases. At the same time, it destroyed tremendous value by filing unnecessarily when nothing resembling a liquidity crunch existed. It is important for the Court to quickly address this important governance issue that goes to the heart of the administration of this estate, its efficient and value-maximizing operations, and the chapter 11 process.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding under 28 U.S.C. § 157(a) and 157(b)(2)(A) and (O). *See In re Bozel S.A.*, 434 BR. 86, 106 (Bankr. S.D.N.Y. 2010) (holding that resolution of governance dispute involving the sole shareholder was "quintessential to the administration of the Debtor's

3

Chapter 11 case" and that this was "a central issue that must be resolved before the Debtor could effectively reorganize").

6. This Court also has personal jurisdiction over Seaborn Management under the Management Services Agreement (the "MSA"), in which the parties consented to having disputes over the MSA heard by state and federal courts in New York county. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

7. Plaintiff Seabras Group is a Delaware limited liability company with its principal place of business in Massachusetts. Seabras Group is the 100% owner of Seabras Bermuda, which in turn is the 100% owner of Seabras 1 USA, LLC.

8. Nominal Defendant/Debtor Seabras Bermuda is a Bermuda limited company. Seabras Bermuda is a debtor and debtor in possession in the above-captioned chapter 11 bankruptcy cases pending before this Court.

9. Defendant Seaborn Management is a Delaware corporation and a wholly-owned subsidiary of Seaborn Networks Holdings, LLC. Its business address is 600 Cummings Center, 2nd Floor, Beverly, MA 01915.

## FACTUAL ALLEGATIONS

**A. Seabras Group Provided $220 Million of Equity and Maintained Strong Governance And Contractual Control Rights Over Seaborn Management.**

10. Partners Group Seabras, LLC, Seabras Group's owner, invested more than $222.5 million in Seabras Group, which was used to fund the Debtor and its affiliates in creating and running its business. Partners Group Seabras, LLC is an affiliate of Partners Group, a global investment manager with more than $90 billion in assets under management.

4

11. When making the multi-million dollar investment in Seabras Bermuda, Seabras Group engaged a third-party management company, Seaborn Management, to provide day to day management services pursuant to the MSA.[2] The MSA creates a principal-agent relationship between Seabras Group and Seaborn Management: Seaborn Management and its employees may only act on behalf of Seabras Bermuda subject to, and at the direction of, Seabras Group's Board. Three executive officers of Seaborn Management, Larry Schwartz, Andy Bax, and Roger Kuebel (the "Seaborn Management Team")—served as executive officers of Seabras Group and were appointed by Seabras Group as the sole directors of the Seabras Bermuda Board.

12. Seaborn Management's ability to manage Seabras Bermuda was subject to substantial oversight from, and control by, the Seabras Group Board.[3] Section 2.03 of the MSA, titled "Board Control and Authority," states that Seaborn Management shall provide services only "in accordance with the direction of the [Seabras Group] Board" and that "[t]he [Seabras Group] Board may revoke any authorization granted to the Manager at any time in its sole discretion." MSA § 2.03(a). It also states that "**no authority** of the [Seabras Group] Board is delegated to the Manager by this Agreement, and **the [Seabras Group] Board expressly retains all authority over the Company Entities**," including Seabras Bermuda. *Id.* (emphasis added). Seabras Group also possessed full control rights, including the right to terminate the arrangement at any time for cause, or for no reason at all. *See* MSA § 13.01. Seabras Group also retained the exclusive power to terminate officers and other key employees of Seabras Bermuda at any time. *See* MSA §§ 2.06, 2.08.

---

[2] A redacted version of the MSA is attached as Exhibit 1.
[3] In the MSA, the "Company" is defined as Seabras Group, LLC in the preamble. The "Board" is defined as the board of "the Company," Seabras Group LLC. MSA at 3. The MSA's Section 2.03, "Board Control and Activity" therefore vests Seabras Group with control through each reference to the "Board."

5

13. In addition to imposing oversight over Seaborn Management, the MSA also tightly limited Seaborn Management's authority to act. Seaborn Management was prohibited from executing any "contracts, agreements or other commitments" on behalf of any Company Entity "without the express consent of the [Seabras Group] Board" unless:

> (i) such contracts, agreements or commitments are not in excess of the Then-Effective Budget, (ii) the value of each individual contract, agreement or commitment does not exceed $250,000 and the aggregate value of all contracts, agreements or commitments executed during any Fiscal Year does not exceed $1 million and (iii) such contracts, agreements and other commitments are not otherwise material to the business and do not relate to a transaction between a Company Entity, on the one hand, and any Member of the Company or any Affiliate of a Member of the Company [*i.e.*, the Manager], on the other hand.

MSA § 2.03(b). Similarly, Seabras Group could "diminish the Manager's authorization" to have even this level of authority. *Id.*

### B. The Directors of The Seabras Bermuda Board Were Appointed By Seabras Group And Subject To The Control of Seabras Group.

14. Under the MSA, and until moments before they secretly and self-interestedly put Seabras Bermuda into bankruptcy, the Seaborn Management Team also served as managers and officers of Seabras Group, and in that capacity were also subject to the control of the Seabras Group Board. This carefully constructed governance regime allowed Seabras Group to exercise full control over Seaborn Management regardless of whether its employees were operating on behalf of Seabras Bermuda or Seabras Group. Total control and oversight is the only reason why Seabras Group allowed Seaborn Management to do anything on behalf of either entity. Total control and oversight also acted to align the interests of the day-to-day manager, Seaborn Management, with the interests of Seabras Group, which owned Seabras Bermuda.[4]

---

[4] The Seabras Group LLC agreement also required the Company to obligate the boards of all subsidiaries to submit to the Seabras Group Board for approval any action that would require board approval if executed by Seabras Group itself. Seabras Group LLC Agreement at § 6.01(e).

### C. The Lenders Could Have—But Never Did—Exercise Voting Control.

15. As part of the project financing, Seabras Group also entered into an interlocking set of financing documents. The primary document governing the relationship between Seabras Bermuda, Seabras Group, and the Lenders[5] is the September 15, 2015 Amended and Restated Facilities Agreement (the "Credit Agreement"). The Credit Agreement specifically addresses the parties' rights and remedies upon the occurrence of an event of default. The Credit Agreement makes clear that the Lenders may exercise voting rights at the Seabras Bermuda Board level, but were not required to.

16. The Credit Agreement lays out a series of events constituting "Events of Default." The Credit Agreement also provides the remedies available to the Lenders in the event of such defaults. *See* Credit Agreement § 22.20. Specifically, Section 22.20 requires that the Lenders' agent may only act to exercise the Lenders' remedies in the event of default "on the instructions of all" the other involved Lenders. Section 22.20(c)(iv) of the Credit Agreement further provides (after an event of default) that the specific rights Lenders' agent may exercise after receiving written instructions from all of the involved Lenders, including, that Lenders' agent "may by written notice to the Borrower . . . exercise or direct the . . . exercise [of] any or all of its rights, remedies, powers or discretions under the Finance Documents." Therefore, the Lenders, upon an event of default, would have the right, but not the obligation, to exercise rights.

17. In connection with the Credit Agreement, the parties executed security agreements "to secure all Obligations and as required under the [Credit] Agreement," including the Offshore Pledge Agreement (the "Pledge Agreement").[6] The Pledge Agreement creates a

---

[5] Herein, the term "Lenders" is used to refer both to the banks' agent, Natixis, as well as the banks themselves, which act through Natixis.
[6] The Pledge Agreement is specifically referred to as one of the "Finance Documents" that the Lender may choose to exercise rights under.

security interest in favor of the Lenders in the pledged assets, but operates only within the larger structure of the Credit Agreement.[7] The Pledge Agreement allows the Lenders, upon and during the continuance of an Event of Default, to "exercise all voting power with respect to the Pledged Securities of such Pledgor." However, the Lenders must take a series of additional steps to exercise voting rights based on the Pledge Agreement, steps the Lenders have repeatedly declined to take. Those rights were not self-effectuating under the finance documents themselves.

18. Moreover, Bermuda law, the law governing Seabras Bermuda's associated governance rights, unambiguously requires the Lenders to take certain additional steps to transfer the right to participate in Seabras Bermuda's corporate governance. Section 48(2) of the Bermuda Companies Act of 1981 provides that, unless corporate by-laws provide otherwise, **"it shall not be lawful for the company to register a transfer of shares in . . . the company unless a proper instrument of transfer has been delivered."** (emphasis added). The bye-laws[8] of Seabras Bermuda require that any transfer of shares be effected by an instrument of transfer to be signed by the transferor (and in certain cases by the transferee). Seabras Bye-law 12.1. They further provide that "the transferor shall be deemed to remain the holder of the share until the name of the transferee is entered into the Register [of Shareholders] in respect thereof." Seabras Bermuda Bye-law 12.2. Seabras Bermuda is not required to recognize any person as holding any share or any other right in respect of any share until such person is a registered shareholder. Seabras Bermuda Bye-law 5.4.

---

[7] The Pledge Agreement specifically provides that "the Lenders have agreed to make loans or otherwise extend credit to the Borrower upon the terms and subject to the conditions specified" in the Credit Agreement. By its terms therefore, the Pledge Agreement functions as a subsidiary document subject to the conditions imposed by the primary structuring document, the Credit Agreement.
[8] The Bermuda (English) spelling is "Bye Laws."

8

19. Prior to the filing of this bankruptcy, no party disputed that Seabras Group would retain its governance rights over Seabras Bermuda even after an Event of Default. In November 2019,[9] an Event of Default occurred under the Credit Agreement. However, the Lenders declined to take steps necessary to exercise voting control over Seabras Bermuda. Instead, the agent for the Lenders merely reserved its rights to do so in the future, and acknowledged that it had not exerted voting control.

20. There is good reason why the Lenders never took the position that voting control flipped automatically to them upon an event of default. The Debtor operates in the heavily regulated telecommunications industry. As a result, its continuing operation is subject to a variety of regulatory approvals.[10] Among them, if there is any change to the entity that "will hold voting control" of the license-holder[11]—identified in the grant of authority as an entity that ultimately controls Seabras Group——new regulatory approval would have to be sought in advance, not only from U.S. regulators but also likely from their Brazilian counterparts and, effectively, the Debtor could no longer legally operate (or else be in violation of the law).[12] The Lenders never took voting control over the Debtor and never took the position that such voting control had flipped to them. Instead, they merely reserved their rights following an event of default.

---

[9] There were also other events of default earlier in 2019 as well, which were not accompanied by any claim that Seabras Group had lost control.

[10] Among other things, these licensing approvals depend on the controlling entity of a particular operator. For example, 47 C.F.R. § 1.767(g)(6) provides that "[e]xcept as provided in paragraph (g)(7) of this section, the cable landing license and rights granted in the license shall not be transferred, assigned, or disposed of, or disposed of indirectly by transfer of control of the licensee, unless the Federal Communications Commission gives prior consent in writing." Paragraph (g)(7) referenced in the regulation refers to a "pro forma assignment" that does not result in an actual change of a controlling party. That exception plainly does not apply here as Debtor itself contends that the change in control contemplated here is anything but pro forma.

[11] The license holder is Seabras-1 USA, LLC, which is controlled by Seabras Bermuda.

[12] This provides an additional reason why the parties did not view § 5.02 of the Pledge Agreement as self-executing. To the extent that a change in control was required, all parties understood that the lack of regulatory approval would significantly impede the value of the asset by effectively precluding further operations.

### D. Seaborn Management Hatches A Plan to Usurp Control.

21. In late 2019, after months of poor performance, the Seaborn Management Team began to be outright insubordinate to Seabras Group. Instead of subjecting itself to the scrutiny of Seabras Group and complying with its contractual and fiduciary obligations, the Seaborn Management Team hatched a plan to sever itself from Seabras Group's oversight. The Seaborn Management Team, without any approval or knowledge from the Seabras Group Board, purported to novate the MSA from Seabras Group to Seabras Bermuda without the Seabras Group Board's authorization. Incredibly, the same two individuals from the Seaborn Management Team—Larry Schwartz and Andy Bax—purported to execute the so-called "MSA Novation" **on behalf of all three entities,** Seabras Group, Seabras Bermuda, and Management:

> Attn: Larry Schwartz / Roger Kuebel
> Email: larry@seabornnetworks.com / roger@seabornnetworks.com
>
> IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.
>
> SEABORN MANAGEMENT, INC.
>
> _____          _____
> Name: Larry Schwartz                Name: Andy Bax
> Title: Chief Executive Officer      Title: Chief Operating Officer
>
> SEABRAS GROUP, LLC
>
> _____          _____
> Name: Larry Schwartz                Name: Andy Bax
> Title: Chief Executive Officer      Title: Chief Operating Officer
>
> SEABRAS 1 BERMUDA LTD
>
> _____          _____
> Name: Larry Schwartz                Name: Andy Bax
> Title: Chief Executive Officer      Title: Chief Operating Officer

22. While the MSA authorized the Seaborn Management Team to enter into certain smaller contracts on behalf of the Debtor, section 2.03(b) <u>explicitly</u> required approval of the Seabras Group Board for material contracts or any contracts that relate to arrangements between Company Entities and any entity affiliated with a Member of the Company or an Affiliate of a Member of the Company. MSA § 2.03(b). The Seaborn Management Team's attempt to novate the MSA was both, and was wholly unauthorized.[13]

23. Shortly after learning of the so-called "MSA Novation," the Seabras Group Board convened and ordered the Seaborn Management Team to resign from the Seabras Bermuda Board and to take certain other actions. The Seaborn Management Team refused. Instead, Seaborn Management, through its General Counsel (who now purported to also be the Debtor's General Counsel), stated that Seabras Group's only remedy was to exercise its rights as sole shareholder to request a shareholder meeting and vote to remove the directors from the Seabras Bermuda Board. Seaborn Management took this position as a play for time, recognizing that under Bermuda law directors could seek to drag out the process for their removal. Those lame duck directors—who had acted outside their authority as agents of Seabras Group and had been called on it—set an April 1, 2020 shareholder meeting for their removal.

24. Despite the Seaborn Management Team's insubordination, Seabras Group understood that Seaborn Management was in possession of critical assets of Seabras Group and Seabras Bermuda. Instead of escalating and engaging in litigation to compel compliance, Seabras Group continued to exercise its control rights through the MSA. The Seaborn Management Team never took the position that such supervision was not permitted. On December 20, 2020, members of the Seabras Group Board met with Seaborn Management to discuss the budget for 2020 and operational concerns. The message from this meeting was clear:

---

[13] Even the terms of the purported novation still demonstrate that Seabras Group retained control.

Seabras Group was directing Seaborn Management to improve operations and cut back on expenses.

25. None of the Seaborn Management Team members mentioned—nor did Seabras Group contemplate—any cash crunch that would have required putting Seabras Bermuda into chapter 11. Indeed, Seabras Bermuda had few upcoming obligations and reserve and cash accounts of more than $50 million dollars, well in excess of any upcoming liabilities. None of the Seaborn Management Team members mentioned—nor did Seabras Group contemplate—any possibility that Seabras Group was not in control of the MSA, Seaborn Management, or Seabras Bermuda. But the Seaborn Management Team was concerned that Seaborn Management's cash stream would be cut, and decided to take matters into their own hands. Again without authority or advance warning, Seaborn Management commenced these chapter 11 cases, and then sought a TRO to attempt to shed further supervision from Seabras Group and paralyze appropriate governance from occurring in the early days of these cases.

26. On December 24, 2019, Seabras Group exercised its rights as the sole shareholder of Seabras Bermuda to increase the maximum number of Seabras Bermuda Board seats to eight and to appoint five additional directors to the Seabras Bermuda Board. Upon making these director appointments through a shareholder's resolution of Seabras Bermuda, Seabras Group delivered said shareholder's resolution to Estera, the Bermudan corporate secretary, who readily recognized and accepted its validity, including adding the newly appointed directors to the Directors & Officers Register of Seabras Bermuda (the "D&O Register"). When the newly constituted, and validly appointed, Seabras Bermuda Board called a meeting of the directors, Seaborn Management, purporting to act on behalf of the Debtor, obtained a TRO from this Court to stop the newly appointed Seabras Bermuda board members from meeting. When the

prudential standing of the Debtors was questioned by the Court, Seaborn Management chose to dismiss that case rather than have the Court address the issues.

27. During the pendency of the TRO, on information and belief, Seaborn Management or those acting on its behalf also contacted Estera to direct that it remove the five new Seabras Bermuda director appointees from the D&O Register because there was a dispute over the appointment. After being informed of the TRO, Estera sent Seabras Group an email indicating that it decided to remove the five newly appointed directors from the D&O Register out of a desire to take a "neutral position" during the dispute. Conveniently, after Estera made the change to the D&O Register, Management dismissed the TRO that it brought (without prudential standing) in order to delay the Seabras Bermuda Board meeting and to improperly influence the decision of Estera to change the D&O Register. The improper change to the D&O Register does not change the fact that Seabras Bermuda currently has eight directors, five of which were appointed by Seabras Group on December 24, 2019.

28. Seabras Group files this action to settle the dispute relating to these critical governance rights. It is essential that Seabras Group is allowed to do so to maximize and preserve the value of the Debtor in which it has invested more than $220 million dollars, and whose assets have significant equity value. This issue is pivotal to the efficient running of this estate and its future reorganization prospects.

## COUNT ONE
**(Declaratory Judgment)**

29. Seabras Group hereby incorporates paragraphs 1 through 28 of this Complaint as if fully set forth herein.

30. As described above, an actual controversy of a justiciable nature presently exists as to the governance rights and obligations of the Debtors so as to make an award of declaratory relief at this time just, necessary, and proper.

31. In order to resolve this controversy, which is currently impairing the ability of Seabras Group to exercise its lawful governance rights over its wholly-owned subsidiary, Seabras Group requests that the Court issue the declarations made specifically in the request for relief section below.

## COUNT TWO
**(Preliminary and Permanent Injunction)**

32. Seabras Group hereby incorporates paragraphs 1 through 31 of this Complaint as if fully set forth herein.

33. As described above, Seaborn Management, purporting to act on behalf of the Debtor, has taken steps to interfere with Seabras Group's ability to exercise its governance rights over the Debtor. Interference with the proper rights of governance is an irreparable injury, which Seabras Group is currently suffering and will suffer in the future without a preliminary and permanent injunction.

34. In order to put a halt to this interference and the associated irreparable injury, Seabras Group requests that this Court, upon sufficient proof, issue the preliminary and permanent injunction requested below.

## REQUEST FOR RELIEF

**WHEREFORE**, pursuant to Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure, Section 105 of the Bankruptcy Code, 11 U.S.C. § 105, and the Federal Declaratory Judgements Act, 28 U.S.C. §§ 2201, et seq., Seabras Group respectfully requests:

35. The entry of a declaratory judgment:

    a. declaring that Seabras Group validly possesses all the governance and control rights over Seabras Bermuda as set forth in the MSA;

    b. declaring that an event of default under Seabras Bermuda's credit facility did not automatically sever voting control, and that Seabras Group's appointments to the Seabras Bermuda Board are valid;

    c. declaring that even if an event of default under Seabras Bermuda's credit facility had severed voting control, then such an event of default did not end Seabras Group's right to direct the activities of Seaborn Management pursuant to the MSA; and

    d. otherwise determining the respective rights and liabilities of the parties in this context; and

36. The entry of a preliminary and permanent injunction:

    e. Preventing Seaborn Management or anyone acting in concert with it from taking any action inconsistent with Seabras Group's rights in the MSA;

    f. Preventing the Debtor, Seaborn Management, and those acting in concert with Seaborn Management from interfering with the exercise of the foregoing governance rights of Seabras Group; and

37. All other relief to which Seabras Group is justly entitled.

| | |
|---|---|
| Dated: January 9, 2020 | SIDLEY AUSTIN LLP |
| New York, New York | /s/ Penny Reid |

                                         Bojan Guzina (admitted *pro hac vice*)
William E. Curtin
Justin F. Song
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
bguzina@sidley.com
wcurtin@sidley.com
justin.song@sidley.com

-and-

Penny Reid
Angela C. Zambrano (*pro hac vice* pending)
Robert S. Velevis (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 969-3501
Facsimile: (214) 981-3400
penny.reid@sidley.com
angela.zambrano@sidley.com
rvelevis@sidley.com

*Counsel for Plaintiff*